**RICH LUMBER COMPANY, Incorporated,**

v.

**UNITED STATES of America,**

Civ. A. No. 52-455.

United States District Court
D. Massachusetts.

Oct. 17, 1955.

Jackson J. Holtz, David A. Rose, Boston, Mass., for plaintiff.

Anthony Julian, U. S. Atty., Arthur I. Weinberg, Asst. U. S. Atty., Boston, Mass., H. Brian Holland, Asst. Atty. Gen., Mamie S. Price and Andrew D. Sharp, Dept. of Justice, Washington, D. C., for defendant.

WYZANSKI, District Judge.

The only point presented is whether a conceded loss sustained by the taxpayer was, within the meaning of § 23(f) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(f), "sustained during the taxable year" 1947.

The taxpayer kept its books upon the accrual basis. It owned timber lands in

6. Langford Inv. Co. v. Commissioner of Internal Revenue, 5 Cir., 1935, 77 F.2d 468, 470.

Vermont. Following negotiations begun by the treasurer of the taxpayer corporation with an agent of the Department of Agriculture, the taxpayer on May 1, 1947 executed a "Land Purchase Option and Contract" with the United States Department of Agriculture.

By the terms of that contract taxpayer agreed to sell to the United States at $9.25 per acre taxpayer's tracts in Bennington County, Vermont, on condition that, within twelve months of the date of that instrument, the offer be accepted in writing and notice thereof be communicated to the treasurer. In the contract the tracts were described by number and were said to contain 4,793 acres, more or less. The taxpayer gave the United States during the option period the right to enter and to use the land for national forest purposes. It also agreed that during that period it would neither do nor suffer any act by which the value or title to said lands might be diminished or encumbered. Paragraphs 2, 7, 8, and 12 of the contract provided:

"(2) The vendor further agrees, after acceptance of the option, and upon request of the Secretary or one of his representatives, to execute and deliver, without payment or tender of the purchase price, a good and sufficient general warranty deed or deeds (except as otherwise provided by law), conveying to the *United States of America and/or its assigns*, the land herein optioned. The vendor agrees to deliver, without cost to the United States, such other papers as may be required, including any abstract or certificate of title relating to the land which the vendor may have, which shall be returned if the purchase is not consummated. Such deed or deeds, as may be required to convey title to the land from the vendor to the United States of America, shall be prepared by the United States and be recorded at its expense. Necessary revenue stamps to be affixed to the conveyances by, and at the expense of the grantors.

"(7) It is agreed that, if the vendor cannot convey satisfactory title to the land herein described, or if the vendor does not promptly convey said land to the United States when requested to do so by an authorized representative of the Secretary, the land may be acquired by judicial proceedings, and, if so acquired, payment at the rate per acre hereinbefore set forth for so much of the acreage as is found to be vested in the vendor, will be accepted as full settlement for all damages caused to said vendor by reason of the taking of said lands. The vendor also agrees that this instrument may be introduced in such proceedings as the stipulation of the parties hereto with regard to all matters contained herein.

"(8) It is agreed that an abstract, certificate of title, or other evidence of title satisfactory to the Attorney General of the United States will be (furnished by and at the expense of the vendor). If the vendor who, having agreed to furnish evidence of title, fails to deliver to the Department of Agriculture an abstract of title, certificate of title, or other satisfactory evidence of title within 3 months from the date of the acceptance of this option, the same may be prepared or procured by the United States and the cost thereof deducted from the purchase price of the land.

"(12) In consideration of the foregoing, the Secretary for and in behalf of the United States of America, agrees, subject to approval by the National Forest Reservation Commission, to acquire the land herein described, at the price per acre hereinabove set forth, and in accordance with the terms of this instrument, and further agrees that, after the approval of the title by the Attorney General, as vested in the United States, and the presentation of the necessary Government voucher or vouchers therefor, to cause to be paid to the vendor the purchase price in accordance with the terms of this agreement."

The Secretary of Agriculture on May 20, 1947 executed the Land Purchase Option and Contract, subject to the approval of the National Forest Reservation Commission, and notified the tax-

payer. May 20, 1947 the. Commission approved.

Later in 1947 the representatives of. the Department entered the. land and surveyed it. The taxpayer submitted an abstract of title. It completely settled two claims by securing in 1947 from the claimants quit-claim deeds. From the only other claimant, it received during 1947 a deed approved as to form by the Department; and for that claimant in 1947 it executed a check in payment, and gave it to a lawyer to hold in escrow.

Before the end of the year 1947 the current situation was fully explained to the directors of the taxpayer corporation. Regarding the transaction with the government as closed, they abandoned their intent to use the land for a saw mill, and instead acquired for that purpose land in Massachusetts.

In response to an inquiry from an accountant who was examining taxpayer's accounts for the purpose of preparing its 1947 tax return, the Department of Agriculture on January 18, 1949 wrote that "This land is being acquired at the price of $9.25 per acre subject to final surveys and title work. It was originally thought that the tract had 4,793 acres which would give a valuation of $44,335. While final figures are not as yet available, it now appears that the total valuation of this tract will probably be only slightly in excess of $42,000."

In 1949 the Department of Agriculture determined to acquire and did acquire the tracts not under the voluntary provisions of the option contract, but by eminent domain at the prices stipulated in the contract.

The foregoing facts fall squarely within the rule enunciated in Lucas v. North Star Texas Lumber Co., 281 U.S. 11, 13, 50 S.Ct. 184, 185, 74 L.Ed. 668. There it was held that the purchase price could not be entered as income in the year in which the taxpayer entered into an option contract for the sale of its land because in that year "unconditional liability of vendee for the pur-

chase price was not created in that year."

Hence in. the case at bar the North Texas case requires this Court to support the government's contention that the taxpayer is not entitled to a deduction for loss in 1947 with respect to its timber lands.

The taxpayer attempts to escape this conclusion by reliance upon various cases, so readily distinguishable as not to require comment. Here the option contract was conditional in theory, and in fact—for not until 1949 did the government proceed and then it resorted to judicial proceedings to take the timber land. While the contract limited the taxpayer's compensation rights in those judicial proceedings, that contract was not the *fons et origo* of the government's right to take by eminent domain.

Judgment for defendant.